THE PARK CITY.

(District Court, D. Connecticut. April 19, 1906.)

No. 1,428.

COLLISION—STEAMER AND DREDGE AT WORK—NEGLIGENT NAVIGATION.

A steamer *held* not exonerated from liability for collision with a dredge at work in the harbor of Bridgeport, Conn., in the daytime, which occurred by reason of the steamer attempting to pass on the outside of the dredge beyond the side of the channel to avoid vessels on the other side, and becoming unmanageable on account of the mud, and because of her excessive speed, on the ground that the master was misled by the position of a buoy, which had been moved by the dredge, where there was a range known to him, and to all navigators of the harbor, which he should have observed in the exercise of ordinary care, and which would have given him the true position of the buoy.

In Admiralty. Suit for collision.

Pullman & Marr, for libelant.

Seymour & Knapp, for claimant.

PLATT, District Judge. On Wednesday, December 23, 1903, and for some time prior thereto, the dredge Empire State had been used by its owner, John P. Randerson, in the work of improving the channel in Bridgeport Harbor. This was going on under a contract with the United States lawfully entered into by the War Department, and was under the supervision of United States officers, one of whom was on board at the time of the accident soon to be described. The work in hand under the contract was to widen the channel, by removing mud on the eastern side thereof, so as to make an average depth of 18 feet at low water for a width of 200 feet. The dredging had been in progress for about two weeks, beginning abreast of the Bridgeport Light and advancing, at different widths, towards the city, until the Saturday prior to the accident, when it was confined to a straight cut to the northerly of 30 feet in width. In all the work, however, from the Light up the easterly edge of the cut had been on a continuous straight line.

At about 10 o'clock a. m. of the Wednesday above mentioned, the dredge was engaged in excavating mud along said straight cut, about 3,000 feet northerly from said Bridgeport Light. Its dimensions were, 90 feet long, 34 feet 6 inches wide, 9 feet 4 inches hold. It was kept in position by four stout timbers called "spuds," which were sunk down, through slots at each corner, far enough into the mud on the bottom to enable the dredge to properly perform its work. A scow about to be filled was lashed to the dredge on its westerly side, and a tug had just carried a scow which had been filled across the channel to the west, intending to carry it down the channel to the south, but in making the turn the scow had become stuck in the mud on the west side of the channel. A tug towing several barges, three of which were abreast, was in the channel nearly opposite the dredge and westwardly of the lashed scow, and by these means the channel to the west of the dredge was so blocked, when the Park City was 1,000 feet or so below that point, that it was not practicable to continue on the west side of the dredge, unless the steamboat were kept at a very slow rate of speed, or possibly stopped entirely.

The Park City is a steamer engaged in the business of carrying passengers and freight between Port Jefferson, Long Island, and Bridgeport, and, for that purpose has made about three trips each week in each direction. She had been so engaged ever since she was built in 1898. She is 150 feet long over all, 28 feet wide, and draws 10 feet of water. Her best speed is a little over 12 knots. She was running four or five knots an hour at the time she struck the bank just before the accident. Captain Tooker's entire experience as a navigator had been gained upon this route, beginning in 1882. In this situation the captain of the Park City decided to go past the dredge on the east. In making the attempt his boat stuck in the mud on the east bank of the channel several hundred feet south of the dredge,

and failed to respond readily to her helm. Every effort was made from that moment to control the steamboat, but before she could be diverted from her course, or her motion stopped, her bow struck against the stern of the dredge, a little east of the middle, and inflicted some damage. The amount of damage is only important at this time in so far as it throws light upon the force of the blow which the steamer gave the dredge and may aid us in determining at what speed she was traveling. Witnesses for the Park City claim that the blow was trifling, almost a laughing matter, and that, given 20 feet more distance to go, she would have come to a standstill. The injuries to the dredge are, however, practically undisputed, and from the testimony about them and the effect upon the stem of the Park City, I am satisfied that the latter must have been traveling at considerable speed, certainly several miles an hour. While going up the channel from the Bridgeport Light, there was a range which, since February, 1894, had been of common knowledge to all mariners acquainted with the harbor. It was taken by the Beacon Light and a tall chimney on the Holmes & Edwards factory, now owned by the International Silver Company. Vessels following that range would have 120 feet of deep water on their west and 80 feet on their east.

The testimony shows that, just prior to executing the maneuver which culminated in the accident, the Park City had been substantially on this range, and so the captain of the Park City had an opportunity to avail himself of the knowledge which this range might have given him. It is obvious that, if the dredge had been 50 or 60 feet out into the channel toward the west, she would have been within 20 or 30 feet of that part of the channel which a glance at the range would have indicated. In such case, the remaining distance on the west would not have been over 150 feet, and not enough to accommodate all the obstructing craft which were in plain sight. The captain testified that he paid no attention to the range after he saw the harbor blocked, and that what he went by was the location of buoy No. 6 and his own judgment.

This brings me to the story of buoy No. 6. That buoy had been located for a long time on the eastern bank of the dredged channel. On the Monday preceding the accident, as the dredge Empire State was working along up the harbor, deepening the channel 30 feet on its easterly side, Mr. Robinson, who was supervising the work under the War Department, saw buoy No. 6 ahead of the dredge, in such a position that it would act as an obstruction to the dredge in its work of cutting the 30 feet additional on the easterly side of the channel. He therefore ordered the buoy moved from the position it then occupied on the bank of the channel just far enough to the eastward, so that it would not obstruct the dredge as it continued work. It was thus left is about the same relative position to the easterly bank after the 30-foot cut as it had occupied prior to the cut. Work on the cut proceeded, until at the time of the accident the dredge was about 800 feet nearer Bridgeport than the buoy, which was left where Mr. Robinson, the government supervisor, had ordered it placed. Here the combat rages. The libelant claims that it was properly moved, and that the

claimant in his answer has not alleged that it was unlawfully moved. The claimant insists that the War Department could not control the matter; and, whether that be so or not, that there is no testimony which establishes the fact that the moving was done under such authority; and that, if it was necessary to move it, notice should have been given at once to the lighthouse board, who would have notified mariners of the fact by bulletin.

It is an interesting contest, about which, if I were driven to it, I should be inclined to agree with the libelant, but I cannot see that, as I look at the case, it is in any way a material matter. The accident was not inevitable. Out of Captain Tooker's mouth we are confirmed in our opinion that it resulted from his own error of judgment. He claims that he was misled in his judgment by reason of the fact that buoy No. 6 had been moved 50 or 60 feet toward the east. If at the time of the accident he thought the buoy was on the east bank of the old channel, as he claims, then he was obliged to believe that the dredge was 50 or 60 feet west of the old channel's easterly bank, and this he admits in his testimony. He says in plain terms that he thought it was that distance out into the old channel, and we have seen that this would have brought it almost onto the range which he ought to have looked at. The dredge was only 800 feet up channel beyond the buoy. It was at work dredging the easterly bank, and had been so doing for 10 days. Captain Tooker had navigated the Park City in and out of the harbor, past the dredge at work, three times a week in each direction, and knew what it was doing. It had just loaded a scow, which was being towed across the channel, and so formed one of the obstructions which led the captain to execute his flank movement toward the east. Another scow was lashed to its westerly side to be filled, and that gave the captain another reason for his action. A tug hauling three scows abreast added another reason. It was his duty, in view of the condition of affairs which I have endeavored to portray, to have come up that channel with quite a deal of caution. It was no holiday jaunt which he was indulging in. He knew what the dredge was doing, and ought to have known that it could not have cut the the 30-foot widening without having moved the buoy toward the east and out of the line of its progress. It seems to me that, if the captain had only used ordinary care, which is less than his duty demanded, he could not have been misled by the location of the buoy. If he had been governed by the range, the dredge, the buoy, and all the other surrounding circumstances, and his judgment, it is impossible to believe that he could have been misled. It was therefore because of his negligence that the steamboat went aground, and it was because it went aground that it became unmanageable and injured the Empire State.

From another point of view his negligence can be established. The buoy was in the same relative position on the new as on the old bank. Therefore, in permitting the Park City to shave the old bank as closely as he supposed he was doing, he would have run his boat aground on the old bank, if it had been where he thought it was, and then the accident would have followed in due course. From his own

statement it appears that he was taking an unnecessary risk in going so far to the east. To use his own words, it was "very close work," but he thought there was more room on the east than on the west, and so he used his judgment.

Upon the evidence the accident described was due to the negligence of the captain of the Park City, and nothing done by those in charge of the Empire State contributed thereto.

Let judgment be entered for the libelant. The matter of damages was left unsettled at the hearing. A commissioner will be appointed to assess them.