## THE MANHATTAN.

### THE BESSEMER.
### No. 103.

District Court, E. D. Pennsylvania.
Feb. 27, 1932.

E. W. Wells, U. S. Atty., of Philadelphia, Pa., and J. Frank Staley, Asst. Atty. Gen., for the United States.

Lewis, Adler & Laws, of Philadelphia, Pa., for defendant.

KIRKPATRICK, District Judge.

This is a suit in admiralty for damages arising out of the sinking of the government dredge Manhattan by the tanker Bessemer in a collision which occurred at 2:55 a. m. November 22, 1929, in the lower end of the Bellevue range section of the Delaware river channel, a short distance above Wilmington.

There is no suggestion that the Manhattan was at fault in any particular. The sole question is whether the disaster was caused by the fault of the Bessemer, or was an inevitable accident. The Bessemer's contention is that her course was governed by an irresistible sheer to port caused by her encountering in the shoal water to the east of the channel forces of sheer and suction, so powerful that she could not answer her rudder and was temporarily out of control.

The libelant's answer is; first, that there are no such forces powerful enough to have caused the sheer; and, second, that, even if there were, the Bessemer would be responsible for getting so close to the bank.

It will thus be seen that we may eliminate at the outset all questions relating to the navigation of the Manhattan as well as to lights and passing signals on the part of both vessels.

### Findings of Fact.

1. The channel of the Delaware river is 800 feet wide, and of an average depth of 35 to 40 feet. It consists of a series of straight courses or ranges. The Bellevue range is next above the Cherry Island range and intersects it at an obtuse angle; the course up the Cherry Island range being 17° true, and that up the Bellevue range 35°. At the intersection, the channel had, prior to November 22, 1929, been widened on two different occasions by cutting away the bank in the bend of the angle. The last time was in July, 1929, at which time the width at that point had been increased by cutting back the bank, making a total additional width of 200 feet. That work was done between July 8 and July 29, and about the latter date the turning buoy (referred to on the charts and in the testimony as 2–B) which had marked the old channel was permanently anchored, in 27 feet of water, 100 feet to the east of the easterly edge of the newly dredged channel, and about midway in the cut-off portion in the bend.

2. The Manhattan was a suction dredge 268 feet long and 47.6 feet beam. The Bessemer was 388 feet long and 50.9 beam, loaded at the time of the collision, and drawing

26.5 feet forward and 24 aft. She had a navigating bridge, which was located about 50 feet forward of the stern and consisted of a pilot house with two wings, one on each side; access from either wing to the pilot house being by a door with glass panels. She was equipped with Diessel electric engines controlled solely from the pilot house. Her wheel was unusually small, not more than a foot in diameter, and the master testified that it could be "practically turned with a finger." His conclusion that a man accustomed to steering with a big wheel and unused to the quick turn of this little wheel might easily err in turning the wheel too far and giving her "too much wheel" is obviously correct.

3. At about 2:50 a. m. the Bessemer, proceeding up the Cherry Island range directly on the range lights, and therefore in the exact middle of the channel way, approached the intersection of the Cherry Island and Bellevue ranges. She was traveling at full speed or 10½ knots, including the tide. (For convenience it may be noted here that this is about 1,064 feet per minute.) The master, Graul, who was navigating, was standing on the port wing of the navigating bridge. The second mate, Johnson, and the wheelsman, Gillis, were in the pilot house, and a lookout was at his station on the forecastle head. At the same time the Manhattan was moving slowly down the Bellevue range about 150 feet from the west bank of the channel. She had her drags down, and was making about two miles an hour. The night was clear with little wind, and a flood tide (2 miles per hour) was running.

4. The master of the Bessemer sighted the Manhattan on the Bellevue range, concluded (erroneously) that she was in the center of the channel, and determined to pass her on her port hand about 300 feet off. When he had reached a point from which the 2–B buoy bore four points on his starboard bow (which point would be some 1,200 feet below the intersection of the ranges), he gave the wheelsman the order "Port your helm," and his ship swung to starboard to a heading of 42° true. As she neared the buoy the master ordered, "Ease your wheel," and, as she passed the buoy 300 feet abeam, "Steady as you go." The last order put the ship on a course about 41° true, on which she continued for about 1,200 feet until she went outside of the channel limit and into shoal water at a point which I fix as 1,500 feet below the beginning of the straightaway on the west bank of the Bellevue range.

*Comment.*—The gyro record confirms the testimony that the foregoing orders were executed by the wheelsman as given, and shows that the ship was answering her helm. "Ease your wheel" brought her back to about 35°, though the tracing at that point on the record is somewhat difficult to distinguish. It is to be remembered that the recording mechanism of the compass had an error of about 2°; the line always showing that amount short of the actual headings of the ship.

5. At the point last mentioned the Bessemer began to swing to port. The master gave the order "Port your wheel," followed by "Hard aport." The sheer to port continued, and danger signals were blown and the engines reversed. The speed of the ship was checked, but too late, and she collided with the Manhattan at a point about 50 feet below the Cherry Island range front light (the buoy wharf), and 200 feet from the shore. The Manhattan was carried upstream by the force of the collision and the tide, a distance of about 1,200 feet, and sank in five minutes.

*Comment.*—The above are the bare facts of the collision. As found, I believe they are practically undisputed. Whether or not the wheelsman executed the last two orders and whether or not the ship answered her helm are matters which, it will be noted, have not been determined. Before further fact findings are made it will be convenient to consider the theory advanced by the Bessemer, and her position in this case as regards the burden of proof.

When it was shown that on a clear night without influence of wind or weather the Bessemer suddenly sheered across the channel and collided with the Manhattan, the initial burden of proof resting upon the libelant was met and overcome. These basic facts in themselves constituted evidence of fault. Further, since they were not disputed, and since there was no suggestion of fault on the part of the Manhattan, the case in this respect being not very different from that of a moving vessel running into one at anchor in a lawful place, a very heavy burden of proof fell upon the Bessemer in making out a defense.

Her answer was, inevitable accident. Obviously, when she asserted this, she was bound to show not only that the immediate causes of the disaster were beyond her control, but also that she in nowise was responsible for the situation which brought those causes into operation. Her defense of inevitable accident cannot "be maintained if she

voluntarily put herself in a situation where she receives the effect of natural forces, the result of which should have been foreseen and might reasonably have been anticipated." The Mendocino (D. C.) 34 F.(2d) 783, 784. Hence, even if it be assumed that the Bessemer's course just prior to the collision was governed by an uncontrollable sheer caused by forces operating upon her in the shoal water outside the channel limits and causing her to refuse to answer her helm, she must meet and answer the question, How did she come to be there?

Her contention is that the master set his course partially at least by the 2–B turning buoy, that he believed the buoy to be some 300 feet west of where it actually was, and that he was in nowise to blame for this erroneous assumption. The facts upon this point are found as follows:

6. It is a fact that when the channel was last widened, in July, 1929, the buoy was shifted to a point 100 feet east of the new channel limit. It is a fact also that if the channel had been as it was prior to July 1929, and if the buoy had been located precisely on this old channel limit, the Bessemer's course (passing the buoy 300 feet abeam, and allowing for the fact that she intended to straighten out in the channel way of the Bellevue range) would have taken her safely clear of the shoal water.

7. The Bessemer had with her a chart of September, 1928, published by the United States Coast and Geodetic Survey, on which the old channel limits were marked. She had left Texas City on her voyage to Philadelphia too late to get a new and correct edition of this chart, published in October, 1929. The Notice to Mariners published by the Department of Commerce down to and including the issue of November 7, 1929, gave no notice, either that the channel at the intersection of the Cherry Island and Bellevue ranges had been widened, or that buoy 2–B had been relocated, or that such changes were proposed. The same is true as to the various issues of the Notice to Mariners published by the Hydrographic Office; so that it may be concluded that, without fault on the part of the Bessemer, her complement of charts and official information did not contain any notice of the correct location of the turning buoy.

8. The chart of September, 1928, which the Bessemer had, showed buoy 2–B located about 100 feet outside the channel limit. I do not see any reason to hold that a navigator would be justified in assuming that

it was located anywhere other than where the chart showed it to be, and I reject the conclusion sought to be drawn from some of the testimony that all channel buoys shown on charts may be safely assumed to be precisely on the channel limits whether or not they so appear on the chart. The last official information furnished to mariners appears in the Notice to Mariners of August 12, 1921, published after the first widening of the channel, in which it is stated that buoy 2–B had been moved "to edge of recently widened channel in 4½ fathoms of water." It is a well-known fact, emphasized by the caution contained in the Light List which was aboard, that "buoys are liable to be carried away, shifted, capsized, sunk, etc. * * * reliance must not be placed on floating aids maintaining their exact positions."

9. The master of the Bessemer must have known that the channel at the intersection of the ranges had been widened in July, 1929. He was at that time first mate of the J. C. Donnell. From July 6 to July 27, inclusive, that vessel passed the point in question eight times on voyages up and down the river. That was while the work of dredging was actually going on; the buoy then (or until July 23) being in a temporary position 100 feet nearer the center of the channel. From August 11 to October 21, inclusive, the Donnell passed the point sixteen times. Almost all of these occasions were in daylight.

*Comment.*—The master's testimony was that he had been on watch in daylight on the Donnell while the dredges were working in July, 1929, and that he did not recall whether on any of the Donnell's trips he saw that the buoy had been moved over near the center of the channel way. He said in answer to a leading question that he did not know there had been a change either in the lines of the channel or the point where it turned into straightaway, or in the location of the buoy. It may be that he did not recollect the changes, or that they had made very little impression on him, and I do not believe his testimony was intentionally misleading, but I find him chargeable with notice, if not of the exact location of the buoy, at least of the fact that the channel had been widened and the buoy moved to the eastward.

This being the situation, was he justified in taking the course which he did, and was it safe and prudent navigation for him to leave the Cherry Island range lights 1,200 feet before he could get on the Bellevue range?

10. Whatever the appearances might

have been (and even assuming that the Manhattan was on the Bellevue range, which she was not), it would have been perfectly safe for the Bessemer to have followed the range lights up to the intersection and then swung on to the Bellevue range with the lights of the latter in line behind her. The Manhattan, when sighted by the Bessemer, must have been at least 3,000 feet above the intersection. She would have been nowhere near the intersection by the time the Bessemer had reached it, and the latter would have then found that she could have followed the Bellevue range lights in the center of the channel all the way up and still have given the Manhattan at least 200 feet leeway in passing. So long as she kept on the Cherry Island range lights, the Bessemer could be absolutely sure of her course. When she left them she had to rely chiefly upon the 2-B buoy. Of course she had some slight assistance from the Bellevue range lights, but she had just passed the Bellevue front light and was still so close that the slightest divergence from the range would leave the lights so wide open that they would furnish very little help to a navigator, unless he was thoroughly at home in that particular part of the channel. The master did not consult his compass, and, beyond confirming him in his course, it would not have been of great assistance if he had. In general, the course which he was setting was quite safe for one who was thoroughly familiar with the situation, but for one who was not it meant almost exclusive reliance upon the 2-B buoy.

11. I have no doubt that Captain Graul was an experienced seaman and thoroughly competent in general to act as master of the Bessemer. He has held a master's license since 1921; a pilot's license for the Delaware Bay and river since 1926. For five years he had been with the Atlantic Refining Company's ships, serving as third officer about ten months; second officer about six months; and first officer eleven months; absent on sick leave about sixteen months. However, during this period, the only time he acted as master of his ship was on a single round trip to Texas; once down the river and once up. While he was with the Atlantic Refining Company as mate, the master always piloted the vessels up and down the river. There are certain other facts which also have some bearing upon the general question. They are: First, the unusual construction of the Bessemer with her navigating bridge 300 feet aft of the bow; second, the rather novel type of wheel and steering gear; third, the fact that the wheelsman had had, prior to

this watch, only about twenty minutes actual experience in handling this particular wheel; and, fourth, the fact that the Bessemer was deeply loaded, down at the head, and probably slightly listed.

*Comment.*—All the above facts combined to make it a matter of more than usual importance for the Bessemer to follow the ranges as far as possible. "There is no rule requiring a boat to follow the exact ranges; it may, if all conditions permit, go anywhere in the channel; but these range courses constitute the only definite, marked path and the only track that can be accurately kept, especially at night; and to 'follow the ranges' is the regular and normal course of action, just as it is with a wagon to follow the beaten track in a highway." The Queen City (D. C.) 189 F. 653, 655.

See, also, The Park City (D. C.) 144 F. 527; Harrison v. Hughs (C. C. A.) 125 F. 860.

I would hesitate to convict the Bessemer of gross fault in taking the course which she did. However, there was another course which was perfectly safe. There was no reason for her not following it, except possibly the error of the master in placing the Manhattan in the middle of the channel. Even so, he could have safely proceeded a few ship lengths farther and would then have seen her true position. The plain fact is that the Bessemer got into shoal water as a result of two erroneous assumptions on the part of the master; the first, that the Manhattan was in the center of the channel, and, the second, that the buoy was some two or three hundred feet to the westward of where it actually was. Both of these errors, if not wholly excusable, are at least easy to account for. But the defense here is inevitable accident, and it is clear that, on her own showing, the Bessemer unnecessarily, if not voluntarily, placed herself in a position where she was subject to the forces which she claims rendered her unmanageable and produced the collision.

12. I therefore find that the respondent has not met the burden of proof cast upon her by the admitted facts of the collision, and the conclusion must follow that the collision was solely due to fault on the part of the Bessemer.

*Expert Testimony.*—Although not necessary to the decision, I think it worth while in view of a probable appeal to refer briefly to the extremely interesting expert testimony as to the causes of the sheer, and to record some impressions.

Two things seem to stand out from the mass of testimony taken upon this issue:

First. When a ship moves into shoal water, particularly where the volume of water is restricted upon one side as by the bank of a channel or a canal, forces are set up which exercise a disturbing influence upon the behaviour of the vessel. It has been estimated that, in the case of a 10,000-ton vessel moving at 15 knots, 900 tons of water are displaced forward and replaced aft in each second, and it must be that if the flow of water thus set up is markedly unequal upon different portions of the hull, the disturbing influence will be of very considerable extent.

Second. The effect upon the vessel's course of the forces so set up cannot be accurately predicted or appraised.

The trouble is, of course, the lack of scientific data. Such knowledge as there is is drawn principally from observation of the behaviour of vessels under various conditions, which usually contain many unascertained facts.

In each case, the contour of the channel, the slope of the bank, the depth of the water under the keel and its distribution over the shoal, the lines of the vessel, the nature of her propeller action, and the angle of her approach, are all elements which affect the result. Experimentation with actual vessels is practically out of the question. Experiments have been made with ship models in tanks, but those conducted by the government under Admiral Taylor's supervision were primarily for the purpose of developing improved designs for the vessels themselves. Experiments with models have also been conducted for the purpose of observing the suction produced by ships passing or overtaking one another, but very little has been done to determine the effect of banks and shoals with tank bottoms reproducing actual channel conditions.

Lacking sufficient data, general laws are yet to be evolved and the subject remains in a theoretical state. With so many necessary factors to be ascertained in each case, the application of the generally accepted laws of hydrodynamics is largely a matter of speculation. For example, in applying Bernouilli's theorem, Admiral Taylor apparently discounts the retarding effect of friction upon the current on the restricted side of the vessel, and it also appears that he considers the propeller action of small moment. His opinion is undoubtedly entitled to great weight, but, without the aid of extensive experiment, no one can positively say whether these factors are of great importance or not, and I should not attempt to do so.

It seems to me that all that is definitely known is that shoal water will cause erratic action on the part of a vessel, and, so far as it affects the science of navigation, the only general rule that can be laid down is that it should be foreseen and avoided; but I doubt whether the way in which the vessel will act in any given case is predictable.

The fact that scientists and experienced navigators of such high standing, wide experience, and unquestionable sincerity have differed so diametrically upon both the theory and the application of it to the situation in hand, as have the witnesses in this case, confirms the foregoing.

Without any very great feeling of certitude, I should be willing to accept the testimony of Admiral Robison and Captain Sheridan to the effect that when vessels approach the bank of a channel it usually happens that they sheer off toward the deep water side. Their testimony was based upon actual experience, and I cannot doubt that the instances which they have cited were actual occurrences. Even Admiral Taylor who, for the libelant, testified that, under the conditions as they existed in this case, if any sheer had been felt it would have been to starboard, agreed that, had the ship been inclined outward as she approached the area of constriction, the sheer, if any, would have been to port, though he asserted that in neither case would the sheer have been uncontrollable or even appreciable.

But even so, there remains the question of how much value can be given to opinions drawn largely from personal experience of what has occurred upon other occasions, necessarily observed under widely varying conditions; diverse, complicated, and partially unknown factors governing in each instance.

Moreover, assuming that the shoal water on the Bessemer's starboard side was what caused the Bessemer to sheer, it by no means follows that such sheer would have sent her, entirely out of control, across the channel, a distance of some 600 feet from the channel bank, or about 1,500 feet diagonally. Admiral Robison testified that the force which, in his opinion, produced an uncontrollable sheer was "material for about a half a ship's length from the shoal itself," and that "if it is only 200 feet, where the force begins, where the force * * * could take command of the situation." Again:

"Q. Do you mean that at that point (200

feet away from the shoal) the ship ought to respond to the rudder and come back? A. Yes, sir."

But the evidence is that the Bessemer at no time before the collision did come back. Very significant is the record of the gyro compass, which shows that, from the beginning of the sheer to the point of collision, her head was continuously swinging to port. If the collision point is correctly marked on the compass record the ship really had not begun to answer her helm, since there is no trace of a shift to starboard; merely a slowing down of the swing to port. Of course, the collision point may not have been accurately marked on the gyro record, but if it is, then it certainly follows from Admiral Robison's testimony that, whatever the condition was which kept the Bessemer's head continuously swinging to port five or six hundred feet from the bank, it could not have been the external forces set up in the shoal water, but must have been something else; and a wheel turned the wrong way is pretty clearly indicated.

Decree for the libelants, with costs.