TRANSORIENT NAVIGATORS
COMPANY S/A

v.

The M/S SOUTHWIND, her engines, tackle, apparel, etc., in rem

Westwind Africa Line, Ltd., et al.

FLOWER MILLS OF NIGERIA, LTD.

v.

M/V ASTROS, in rem, and Transorient Navigators Company, S.A. in personam, et al.

WESTWIND AFRICA LINE, LTD.

v.

The UNITED STATES of America

The United States Army Corps of Engineers, New Orleans District.

Civ. A. Nos. 77-2107, 77-2410, 78-199.

United States District Court,
E. D. Louisiana.

July 28, 1981.

William E. Wright, New Orleans, La., for plaintiff Transorient Navigators Co. S/A.

John J. Broders, New Orleans, La., for plaintiff Flower Mills of Nigeria, Ltd.

374

J. Dwight LeBlanc, Jr., New Orleans, La., for defendant Westwind Africa Line, Ltd.

Allen van Emmerik, Washington, D. C., for defendant United States and U. S. Army Corps of Engineers.

CASSIBRY, District Judge:

This case arises out of a collision which occurred in the Mississippi River-Gulf Outlet on June 17, 1977 between the inbound vessel, the M/V SOUTHWIND and the outbound vessel, the M/V ASTROS. The Collision occurred when the M/V SOUTHWIND took a sharp sheer across the channel and collided with the M/V ASTROS, which was proceeding up the opposite side of the channel. This court has jurisdiction over this admiralty case under 28 U.S.C. § 1333 and jurisdiction over the United States of America under the Suits in Admiralty Act, 46 U.S.C. § 741 et. seq.

## I. The Litigation

As is not unusual in such cases, the complexity of the various parties attempts to recover exceeds the complexity of the case itself. The plaintiff in Civil Action No. 77–2107, Transorient Navigators Co. S/A, owner of the ASTROS, filed suit against Westwind Africa Line, Ltd., the owner of the M/V SOUTHWIND *in personam* and against the M/V SOUTHWIND, *in rem*, seeking damages arising from the collision. The plaintiff in Civil Action No. 78–199, Westwind Africa Line, Ltd., filed suit against the Secretary of the Army, the Army Corps of Engineers, and the United States of America, contending that its vessel, the SOUTHWIND, sheered across the channel and collided with the ASTROS because of the negligence of the United States in the management, operation and maintenance of the Mississippi River-Gulf Outlet. The plaintiff in Civil Action No. 77–2410, Flower Mills of Nigeria, Ltd., owner of the cargo aboard the SOUTHWIND, filed suit against the ASTROS, *in rem* and against Transorient Navigators S/A, *in personam*, seeking to recover for cargo damage.

The above actions were consolidated by order of the Court on January 20, 1978. Westwind Africa Line, Ltd. thereafter filed answer to the complaint of Transorient Navigators Company S/A, denying liability and filed claim against Transorient Navigators Company S/A, *in personam*, and the M/V ASTROS, *in rem*, claiming that the collision was caused by the negligence of the M/V ASTROS. Transorient Navigators Company S/A filed claim against the United States of America, the Army Corps of Engineers and the Secretary of the Army seeking to recover all damages sustained as a result of the collision. Flower Mills also filed a claim against the United States of America, through the Army Corps of Engineers to recover damages for cargo loss. All parties filed responsive pleadings denying liability to the respective claims. The case was tried before the Court only on the issue of liability.

## II. The Collision and Its Causes

### A. The Setting

The M/V ASTROS, a Liberian flag vessel is a bulk carrier of 14,522.91 gross tons and has a length of 534′ 9″ and a breadth of 86′ 4″. On June 17, 1977 the vessel was light, carrying a partial cargo of coke with a draft forward of 18′ and draft aft of 21′ 7″. She was proceeding outbound or east in the Mississippi River-Gulf Outlet [hereinafter MR–GO]. The M/V SOUTHWIND, also a bulk carrier of Liberian flag, has a gross tonnage of 11,328.51, a length of 482′ 3″, and a breadth of 74′ 10″. On June 17, 1977 the Southwind was heavily laden, carrying a cargo of wheat and general cargo with a draft of 26′ forward and 29′ 8″ aft. She was proceeding inbound or west in the MR–GO.

The Mississippi River-Gulf Outlet is a relatively straight narrow channel dredged through low marsh, beginning at the Michoud Intersection of the Intracoastal Waterway at New Orleans and reaching in a southeasterly direction to the sea. The project channel width is about 500 feet. The banks of the canal, however, are about 700 feet apart and are distinct in some

areas and indistinct in others, depending on the degree of erosion.

The collision occurred in a straight reach of the channel one quarter mile east of navigational light 110. In this area of the channel there is a dredging cut or "borrow pit" whose westerly end is located just to the West of Mile 48 (approximately 3650 feet to the east of Light 110) on the northern side of the channel. The westerly end of the borrow pit has a relatively sharp right angle cut where it returns to the regular channel width. The borrow pit was dredged for the United States Army Corps of Engineers under Construction Contract, DCW 29–76–C–0253 with Mike Hooks, Inc.

The dredging was completed approximately six to eight weeks prior to the collision. However, support vehicles and other equipment remained in the area of the borrow pit until approximately three weeks prior to the collision. During that time vessels passing the area had to hold near the center line and proceed dead slow ahead one vessel at a time. According to the records of the Pilot's Association, no vessels had met and passed each other in the area of the westerly end of the borrow pit following the removal of the equipment from the area prior to June 17, 1977.

B. The Collision

The events surrounding the collision itself are not in serious dispute. On the morning of June 17, 1977 Pilot Mark Delesdernier took over the conn of the SOUTHWIND in the vicinity of Light 98 and conned the vessel at full maneuvering speed inbound towards New Orleans. The vessel continued to proceed inbound to Shell Beach where she slowed to dead slow and then resumed full maneuvering speed on her passage to New Orleans. That same morning, Pilot Alexander Petit boarded the ASTROS at New Orleans and conned the vessel towards light 110 at full maneuvering speed. Both pilots were licensed and qualified as pilots by the State of Louisiana.

At or shortly after 0800 hours the SOUTHWIND and the ASTROS sighted each other and shortly thereafter the captains and the pilots of the vessels spoke to each other by VHF radio and agreed to a port-to-port passage as required by the Inland Rules of the Road, 33 CFR 80.10. At approximately 8:09 the SOUTHWIND went from full ahead to half ahead and at 8:10 she went to slow ahead to slow her speed for the expected meeting and passing with the ASTROS. At approximately the same time, the ASTROS went to slow ahead. (The engine bell recorder of the ASTROS reflects that the order for slow ahead was given at 8:14.5, while the bell book of the SOUTHWIND indicates that it went to slow ahead at 8:10. However, the evidence revealed that the clock on board the ASTROS was approximately one to two minutes ahead of the clock on the SOUTHWIND, thus largely accounting for the timing difference reflected in the orders given aboard the respective ships).

Thereafter, the SOUTHWIND blew a one-whistle signal indicating a port-to-port passage as had been previously agreed. Pilot Delesdernier moved the inbound SOUTHWIND from the center line of the channel to her starboard, which put the SOUTHWIND to the north of the center line of the channel. About the same time the outbound ASTROS moved from the center line to her starboard, putting her to the south of center line. Both vessels did this in order to effect the agreed port-to-port meeting.

The SOUTHWIND proceeded along the north side of the channel, parallel to the borrow pit at about eight knots. Her starboard side was approximately 150 to 160 feet from an imaginary line drawn from the regular bank. At approximately 8:14 Pilot Delesdernier noticed that the helmsman was carrying 10 degrees right rudder and that the SOUTHWIND's heading was still moving slightly to port. At this time the SOUTHWIND was nearing the westerly end of the borrow pit located to the north or to the starboard side of the vessel. Pilot Delesdernier, noticing that his ship's head was continuing to fall off to her port, ordered hard right rudder and full ahead. However, the SOUTHWIND would not pull

out of her sheer to port. She was heading across the center line and toward the on-coming ASTROS. Realizing that the SOUTHWIND was not pulling out of her sheer to port, Pilot Delesdernier ordered full astern and started blowing the danger signal. The two vessels collided thereafter at about 8:16 according to the time indicated in the SOUTHWIND's bridge bell book and according to the ASTROS' logs and records about 8:17 or 8:18. Both vessels' personnel indicated that there was approximately one or two minutes from the time of the sheer to the time of the collision.

Approximately one minute before the collision Pilot Petit on board the ASTROS noticed the SOUTHWIND sheering and ordered dead slow. Almost immediately thereafter, the pilot of the SOUTHWIND called Pilot Petit and advised that the SOUTHWIND was "out of control" and requested that the ASTROS back her engines. The ASTROS immediately responded. At the time of the collision both the SOUTHWIND and the ASTROS were travelling approximately from four to four and one-half knots. The collision occurred approximately one-half mile or five to six cables east of Light 110 on the southwest side of the channel, approximately 100 feet south of the center line. The ASTROS suffered stem damage above the waterline and damage to the bulbous bow. The SOUTHWIND suffered damage forward on the starboard side where she crossed the bow of the ASTROS.

The *immediate* cause of the accident was never seriously in dispute. Professor Pauling, an expert naval architect, testified that the sheer occurred because of the hydrodynamic forces operating on the vessel as it moved along the north bank of the channel. In particular, Professor Pauling explained that the movement of a vessel along a bank produces an imbalance of pressure generated by the water displaced at the bow and stern on the side of the vessel facing the bank. This imbalance produces what is known as a "turning moment", which tends to turn the bow outward from the bank. According to Professor Pauling, there are three variables affecting this effect on the vessel: (1) the speed of the vessel; (2) the size of the vessel; and (3) the proximity to the bank. Therefore when a vessel moving at a constant speed suddenly encounters a change from a wide separation from the bank to a narrower separation the turning moment greatly increases, forcing the bow away from the bank.

Using a ship modelled after the SOUTH-WIND and a bank configuration based on that existing at the place of the collision, Professor Pauling concluded that the turning force generated would overcome the force of the rudder when the vessel was within 175 feet of the extended line of the bank. Beyond 175 feet, he concluded, the rudder of the ship could overcome the force generated by the water displaced by the ship. I found that Professor Pauling's explanation of the cause of the sheer taken by the SOUTHWIND was credible and quite interesting.

It should be noted, however, that Professor Pauling discounted one theory of why the sheer occurred presented by Pilot Delesdernier. At the Coast Guard Hearing into the collision, Pilot Delesdernier testified that he thought that the sheer was caused by a trench or "berm" extending downstream from the original channel bank and separating the dredged area from the main channel. Pilot Delesdernier speculated that the berm acted like a "fin" channeling the water and serving as a bow thruster. However, Professor Pauling testified that based upon his experimentation the berm did not cause the sheer, as any force it might have generated could be easily overcome by the rudder of the SOUTHWIND. Professor Pauling concluded that it was the narrowing of the bank at the edge of the pit, rather than the berm which caused the SOUTHWIND's sheer.

III.   Liability for the Collision

While the parties generally agree as to how the collision occurred and as to the scientific explanation of why it occurred, they fundamentally differ, as might be ex-

pected, as to who is at fault for the accident. In particular, the parties disagree as to the government's obligations in maintaining the MR–GO and warning of allegedly dangerous conditions along its path. They also disagree as to whether Pilot Delesdernier's conduct both before and after the sheer occurred was negligent and a cause of the accident.

The SOUTHWIND's sheer to port across the center line of the channel clearly violated Rule 80.10 of the Rules of the Road for Inland Waters, which states:

> "[I]n narrow channels every steam vessel shall keep to the side of the fairway or mid-channel which lies on the starboard side of the vessel."

Such a statutory violation creates a presumption of liability against the SOUTH-WIND under the rule announced in *The Pennsylvania*, 86 U.S. (19 Wall.) 125, 22 L.Ed. 148 (1874). The SOUTHWIND wisely does not seek to escape that burden by pointing to the conduct of the ASTROS as the reason for the collision. The ASTROS acted reasonably in attempting to avoid the collision and cannot be held responsible.

Instead, the SOUTHWIND claims that the United States was responsible for her sheer across the channel and the resulting collision with the ASTROS. The SOUTHWIND asserts that the United States was negligent in two respects: (1) in creating a hazard to navigation by digging a borrow pit along the channel with a sharp cut at the end of the pit; and (2) in failing to warn pilots along the channel of the conditions in the channel at the site of the borrow pit. Alternatively, the SOUTHWIND contends that the sheer and resulting collision were the result of an inevitable accident since the SOUTHWIND took all reasonable precautions and the accident still occurred. *See Atkins v. Lorentzen*, 328 F.2d 66 (5th Cir. 1964); Black & Gilmore, The Law of Admiralty, § 7–2 at 486 (2d ed. 1975).

The SOUTHWIND contends that the government created a hazard to navigation in digging the borrow pit alongside the channel. In particular, she charges that the right angle cut at the end of the pit created a dangerous condition which caused the sheer and resulting collision. In this regard, Professor Pauling testified that although he had not done any testing of alternative configurations, he thought that the turning moment for a ship passing the end of the pit could be reduced if the end of the pit had been gradually sloped toward the regular bank line. The SOUTHWIND also charges that the Corps of Engineers was negligent in permitting the dredging contractor to leave irregularities along the bottom of the pit which formed a berm. She contends that the contract between the Corps and the contractor, Mike Hooks, Inc., specifically provided "The bottom of the pits excavated under this contract shall be left relatively smooth" and that the Corps was negligent in not enforcing the contract. This contention is largely academic in view of the Court's conclusion, which was based on the SOUTHWIND's own expert, that the trench or berm along the floor of the pit was not responsible for the vessel's behavior.

The SOUTHWIND's attempt to prove the negligence of the Corps of Engineers in dredging the borrow pit was unconvincing. As indicated, Professor Pauling did not actually do any testing using sloping transitions from the pit to the bank so there is no assurance that a more gradual transition would have reduced the turning moment. Nor did the SOUTHWIND present any evidence that any other borrow pit has the sloping configuration suggested by Professor Pauling or that it is feasible to construct such a transition. However, even assuming that the United States may have been able to "build a safer borrow pit" it does not necessarily mean that it is liable for the collision. If the allegedly dangerous condition in the channel was one which should have been obvious to the pilot of the SOUTHWIND and which he could have avoided, then the condition of the channel would be a condition but not a proximate cause of the collision. *See Socony Vacuum Oil Co. v. Smith*, 179 F.2d 672 (5th Cir. 1950); *Philtankers, Inc. v. M/V Don Carlos*,

slip opinion, (S.D.Tex.1981). Therefore, the key issue in this case is whether Pilot Delesdernier should have been aware of the allegedly dangerous condition posed by the transition from the borrow pit to the bank and acted accordingly to avoid the danger.

■ In making that determination it is important to keep in mind that this is not a case of a "weekend sailor" who happens to encounter a dangerous condition. The law places a special duty on the pilot of a vessel based on his expertise and the responsibility he is charged with. The Supreme Court first set out the pilot's special duty in *Atlee v. Packet Company*, 88 U.S. (21 Wall.) 389, 390, 22 L.Ed. 619 (1874). In *Atlee*, a barge collided with a stone pier extending into the Mississippi River. The district court found that both parties were liable since the owner had failed to light the pier and the pilot had failed to find out about the pier. The court of appeals disagreed, finding that only the owner was liable. The Supreme Court reversed and reinstated the district court's decision on the grounds that the pilot was negligent. The Court stated:

> [The] pilot of a river steamer, like the harbor pilot is selected for his personal knowledge of the topography through which he steers his vessel. He must know where the navigable channel is, in its relation to all those external objects, especially in the night. He must also be familiar with all dangers that are permanently located in the course of the river, of sand-bars, snags, sunken rocks or trees, or abandoned vessels or barges. All this he must know and remember and avoid. To do this he must be constantly informed of changes in the current of the river, of sand-bars newly made, of logs and snags, or other objects newly presented against which his vessel might be injured. *Id.* at 396.

The Court noted that it was placing a great responsibility on pilots but concluded:

> [When] we consider the value of the lives and property committed to their control, for in this they are the absolute masters, the high compensation they receive, and the care which Congress has taken to secure by rigid frequent examinations and renewal of licenses, this very class of skill, we do not think we fix the standard too high. *Id.* at 397.

In *Petition of M/V Elaine Jones*, 480 F.2d 11 (5th Cir. 1973) a towboat caught in a strong current collided with a bridge. The District Court found that the towboat owner was negligent but absolved the pilot of the tugboat of any negligence in failing to anticipate the strong current in the river. The Fifth Circuit reversed. After noting the general proposition that "[T]hose who undertake any work calling for special skill . . . are required to possess a standard minimum of special knowledge and ability, Prosser, Law of Torts, § 32, at 164", the court went on to find that since experienced pilots knew of the dangerous currents the pilot encountered in high water, the pilot on board the tow was charged with that knowledge regardless of his actual awareness of the danger.

In an effort to meet the heavy burden placed on pilots, the SOUTHWIND attempted to prove that Pilot Delesdernier had no reason to know of the forces generated by the end of the borrow pit and that their existence would be a surprise to any pilot. Pilot Delesdernier himself testified that he had no idea that a change in the configuration of a bank could cause a vessel moving parallel along the bank to sheer. Professor Pauling testified that he thought that the force generated by an alteration in the configuration of the bank was generally not well-known outside the research community. Finally, the head of the Pilot's Association, Captain Arnoult, testified that he would not have had any concern about navigating the SOUTHWIND within 150 feet from the extended bankline and that in general he "would have done the same thing [Pilot] Delesdernier did."

■ Despite the SOUTHWIND's showing, I believe that the weight of the evidence indicated that Pilot Delesdernier should have been aware of the danger posed by the change in the channel configuration and acted accordingly. Pilot Delesdernier knew of the surface dimensions of the bor-

row pit and the channel. It is undisputed that Pilot Delesdernier knew well before the accident that the Corps was dredging the north bank of the channel in the vicinity of Light 110. Pilot Delesdernier also testified at the Coast Guard hearing into the collision, the transcript of which was admitted into evidence by stipulation, that he was familiar with the surface characteristics of the borrow pit. (C.G. transcript, p. 203). I find his later assertion at trial that it was not clear where the pit ended and the regular bank line began not credible. Pilot Delesdernier therefore was aware of the rectangular cut at the end of the borrow pit and the sudden narrowing of the channel. The relevant question then becomes whether he should have known of the current generated by the rectangular cut.

Although Professor Pauling provided a useful explanation of the scientific causes of the sheer, he was not qualified and did not claim any expertise in the average pilot's knowledge of navigational hazards. Therefore, his assertion that the forces generated by a rapid change in bank configuration were not generally recognized outside the research community was not particularly convincing. Moreover, it seems likely that although a pilot or navigator might not have a scientific explanation of a phenomenon, he or she might know the practical consequences of navigating a ship around certain features in a river or channel. The SOUTHWIND's own witness, Captain Arnoult, who otherwise seemed unwilling to contradict Pilot Delesdernier in any fashion, testified under examination by the Court that he had some understanding of the force generated by a rapid narrowing in a channel:

> Court: Well before this case and before you learned about this particular incident, you had no particular knowledge that moving from a position where there was plenty of water on your right to one where the bank became much closer suddenly, you had no experience that that would cause a rather severe sheer?
>
> Arnoult: Well, I would, yes, I would expect it to cause something but nothing that drastic. It's sort of like if you have a faucet of running water, trying to put your finger up into the faucet. It's got that pressure around the bow of the vessel.

The United States' expert witness, Sheldon Held, a former senior instructor of seamanship and marine engineering at the United States Army Transportation School, testified that sheering caused by the proximity of a vessel to a bank is a well known phenomenon that navigators and pilots should generally be aware of.[1] Held also testified that because of the danger of sheering, caution is critical when a vessel proceeds from a wide channel to a more confined area. He indicated that if he had been faced with the situation faced by Pilot Delesdernier he would not have attempted to pass the ASTROS where the channel narrowed at the end of the borrow pit if he could have avoided doing so. Finally, Held testified that channel conditions such as borrow pits are fairly common and that one would not expect a warning from the government about their presence.

The SOUTHWIND attempted to discredit Held by indicating that he was not an expert in navigation of the Mississippi River-Gulf Outlet and that he did not have experience navigating vessels as large as the SOUTHWIND. However, I found that Mr. Held's testimony was credible and very relevant to the issue of knowledge of general principles that a pilot should know and which Pilot Delesdernier generally testified that he was not aware of.

The SOUTHWIND also contends that the Corps of Engineers was negligent in failing to warn the pilots of the existence and underwater dimensions of the borrow pit. The SOUTHWIND argues that the Corps'

---

1. Indeed, the annals of maritime law are replete with instances of what is referred to as bank sheer or suction. *See, e. g., The Maryland,* 182 F. 829 (E.D.Va.1910); *The Isaac T. Mann,* 12 F.2d 1018 (4th Cir. 1926); *In re Steamship* *Company Norden,* 6 F.2d 883 (D.Md.1925); *The Manhatten,* 3 F.Supp. 75 (E.D.Pa.1933), *affd,* 63 F.2d 995 (3d Cir. 1933); *Al Johnson Construction Co. v. S.S. Rio Orinoco,* 249 F.Supp. 182 (E.D.Pa.1965).

own regulations obligated it to provide information about its dredging operations, including the depth expected and the dimensions dredged.[2] *See Japan Line, Ltd. v. United States of America,* 1976 A.M.C. 355 (E.D.Pa.1975). The failure to notify, the SOUTHWIND concludes, prevented Pilot Delesdernier from correctly assessing the danger presented by the cut in the borrow pit.

As indicated above, the government's witness, Mr. Held, indicated that one would normally not expect the government to publish information about features such as borrow pits. However, even if I were to find that the government was negligent in failing to provide information about the borrow pit, I can not conclude that the failure to notify was a cause of the accident.[3] Pilot Delesdernier testified both in the Coast Guard Hearing and at trial that he did not know that a rapid change in bank configuration could cause sheering. Indeed, after Pilot Delesdernier had a chance to examine a complete survey of the

area done by Odom Offshore Drilling, he still incorrectly identified the cause of the sheer as the trench or berm along the edge of the pit. Therefore, it appears likely that even if the Corps of Engineers had provided complete information about the configuration of the channel, Pilot Delesdernier would not have recognized the danger. As indicated above, Pilot Delesdernier was familiar with the surface configuration of the bank. Therefore it appears that the only warning that the Corps could have provided that would have possibly prevented the accident would be to inform pilots of the current created by the sharp change in configuration of the bank. Yet I have already concluded that Pilot Delesdernier should have been aware of such currents. Therefore, any alleged failure to warn on the part of the United States was not a proximate cause of the sheer and resulting collision.[4]

■ In conclusion, I find that Pilot Delesdernier's negligence, not the negligence

2. Regulation No. 1130–2–306 (May 8, 1978) of the Army Corps of Engineers requires the Corps to provide the following information:

"8. Changes affecting navigation will be made promptly whenever information of immediate concern to navigation becomes known. Items of information especially desired are: (1) channel condition as revealed by surveys; (2) changes in channel conditions, either by natural causes or by dredging or other work; (3) changes in approved projects for improvement with statements of results expected from proposed operations; (4) descriptions of proposed dredging or other Federal work of improvement such as breakwater, pier, and revetment construction or alterations; (5) . . . ."
"b. Additional items of information desired are: (1) . . . (2) unchartered shoals, and other obstructions to navigation and particulars as to proposed or completed removal of same; (3) . . . (4) . . . (5) . . . (6) established or existence of danger areas in navigable waters. Reproductions of drawings or sketches which will be helpful in interpreting the date shall accompany the reports. The reports will not be limited to a reference to an accompanying drawing or sketch, but will contain a complete description in form suitable for publication in notices to mariners and the monthly supplements to the U.S. Coast Pilot. In this respect, the reports will provide enough information that a single notification to navigational interests will suf-

fice. In the case of dredging or construction work, the mere statement that work will commence or has commenced on a certain date is insufficient. All additional information possible, such as probable duration of operations and object of work, will be given. In the case of dredging, extent of the area to be dredged and the depth expected will be provided. . . ."

3. *See Canadian Pacific Bermuda, Ltd. v. United States,* 534 F.2d 1165 (5th Cir. 1976) (no causal relationship between Government's failure to warn and grounding of ship).

4. The SOUTHWIND's argument that the United States failed to notify the pilots of the conditions in the channel also ignores *Atlee* and its progeny, which indicate that a pilot has a special duty to discover local features of navigation which are not found on the charts or notices to mariners. *See* cases cited in *Petition of M/V Elaine Jones,* 480 F.2d 11 (5th Cir. 1973). In this case, Pilot Delesdernier and the other pilots knew of the dredging going on, but failed to inquire of the United States about the scope of the project or its final result. Therefore, even if more knowledge of the channel and burrow pit could have prevented the accident, I do not believe that Pilot Delesdernier can shift the entire fault for the accident on to the United States.

of the United States, caused the accident. Pilot Delesdernier should have been aware of the potential danger when he moved from the wider area of the channel to the more confined area past the borrow pit. As Mr. Held indicated, if Pilot Delesdernier had known of the danger, he could have avoided attempting to pass in the area. Moreover, Professor Pauling's testimony indicated that if the SOUTHWIND had stayed approximately 200 feet from the extended line of the North bank of the channel it would not have sheered. Indeed, Pilot Delesdernier's testimony before the Coast Guard indicated that without the borrow pit *it was customary* for ships to pass each other 50 to 60 feet from the center line—leaving each vessel over 200 feet from the respective banks of the channel. (C.G. transcript, p. 160). Pilot Delesdernier never adequately explained why he was not following this custom on the day he tried to pass the ASTROS. Under the circumstances it appears that Pilot Delesdernier attempted to pass a vessel in an area where he should have known better and that he attempted to pass her in an unsafe manner. As the court stated in *Utility Service Corp. v. Hillman Transportation*, 244 F.2d 121 (3d Cir. 1967):

> If [a pilot] tests the danger of increased current at a place where his common sense and nature's physical laws would tell him that a crosscurrent would embarrass his progress, he does so at his own risk. *Id.* at 124.

Since Pilot Delesdernier should have known that he was pursuing a risky course in passing near the end of the borrow pit, the consequences of his action, the resulting collision, should be borne by the SOUTH-WIND.[5]

---

5. Since I have found that Pilot Delesdernier was negligent in his navigation of the SOUTH-WIND, this is not a case of an inevitable accident.

The United States also attempted to show that Pilot Delesdernier was negligent *after* the SOUTHWIND began to sheer in ordering full ahead immediately after he noticed the sheer. The United States contended that the pilot should have ordered full astern immediately, rather than waiting until he realized the full ahead maneuver would not work. Pilot Delesdernier testified that he ordered full ahead and hard astarboard to attempt to "steer out" of the sheer but that he realized after approximately 30 seconds that the sheer was too severe to steer out of. However, every witness who was questioned, including the government's witness, Mr. Held, indicated that it was reasonable under the circumstances for Pilot Delesdernier to attempt to steer out of the sheer in the fashion he did. Therefore, I find that Captain Delesdernier was not negligent in his attempts to avoid the collision after the sheer began.