714 F.2d 1358
 1985 A.M.C. 1111
 TRANSORIENT NAVIGATORS COMPANY, S.A., Plaintiff-Appellee,
v.
The M/S SOUTHWIND, Her Engines, Tackle, Apparel, etc., in
rem, and Westwind Africa Line, Ltd., Defendants-Appellants,
v.
U.S. ARMY CORPS OF ENGINEERS, Defendant-Appellee.
FLOWER MILLS OF NIGERIA, LTD., Plaintiff-Appellant,
v.
M/V ASTROS, in rem, et al., Defendants,
Transorient Navigators Company, S.A. in personam, U.S. Army
Corps of Engineers, Defendants-Appellees.
WESTWIND AFRICA LINE, LTD., Plaintiff-Appellant,
v.
The UNITED STATES of America, and U.S. Army Corps of
Engineers, Defendants- Appellees.
 No. 82-3253.
 United States Court of Appeals,
Fifth Circuit.
 Sept. 22, 1983.
 
 Chaffe, McCall, Phillips, Toler & Sarpy, J. Dwight LeBlanc, Jr., James R. Holmes, Kenneth J. Servay, New Orleans, La., for M/V Southwind & Westwind Africa.
 
 
 1
 Jones, Walker, Waechter, Poitevent, Carrere & Denegre, John J. Broders, New Orleans, La., for Flower Mills of Nigeria, Ltd.
 
 
 2
 Terriberry, Carroll, Yancey & Farrell, William E. Wright, New Orleans, La., for Transorient Navigators Co.
 
 
 3
 John P. Volz, U.S. Atty., New Orleans, La., Allen Van Emmerik, Dept. of Justice, Civ. Div., Torts Branch, Washington, D.C., for United States and U.S. Army Corps of Engineers.
 
 
 4
 Appeals from the United States District Court for the Eastern District of Louisiana.
 
 
 5
 Before THORNBERRY, GEE and WILLIAMS, Circuit Judges.
 
 THORNBERRY, Circuit Judge:
 INTRODUCTION:
 
 6
 The M/S SOUTHWIND [SOUTHWIND] and its owner appeal the district court's determination that the SOUTHWIND was entirely to blame in a collision with the M/V ASTROS [ASTROS] in the Mississippi River Gulf Outlet [MR-GO]. We conclude that the district court clearly erred in finding that the United States Army Corps of Engineers [Corps] did not share liability for the collision. The Corps breached its duty to publish information which, if available, would have enabled the pilot of the SOUTHWIND to avoid the collision. This failure was a proximate cause of the accident. Accordingly, we REVERSE and REMAND for an apportionment of damages between the SOUTHWIND and the Corps.
 
 FACTS AND PROCEDURAL HISTORY:
 
 7
 The district court's statement of the facts in this case is clear and comprehensive, and would be little improved by our editorial efforts. Accordingly, we have reproduced the district court's statement of the facts below.
 
 A. The Setting
 
 8
 The M/V ASTROS, a Liberian flag vessel is a bulk carrier of 14,522.91 gross tons and has a length of 534'9"' and a breadth of 86'4"'. On June 17, 1977 the vessel was light, carrying a partial cargo of coke with a draft forward of 18' and draft aft of 21'7"'. She was proceeding outbound or east in the Mississippi River-Gulf Outlet [hereinafter MR-GO]. The M/V SOUTHWIND, also a bulk carrier of Liberian flag, has a gross tonnage of 11,328.51, a length of 482'3"', and a breadth of 74'10"'. On June 17, 1977 the Southwind was heavily laden, carrying a cargo of wheat and general cargo with a draft of 26' forward and 29'8"' aft. She was proceeding inbound or west in the MR-GO.
 
 
 9
 The Mississippi River-Gulf Outlet is a relatively straight narrow channel dredged through low marsh, beginning at the Michoud Intersection of the Intracoastal Waterway at New Orleans and reaching in a southeasterly direction to the sea. The project channel width is about 500 feet. The banks of the canal, however, are about 700 feet apart and are distinct in some areas and indistinct in others, depending on the degree of erosion.
 
 
 10
 The collision occurred in a straight reach of the channel one quarter mile east of navigational light 110. In this area of the channel there is a dredging cut or "borrow pit"[1] whose westerly end is located just to the West of Mile 48 (approximately 3650 feet to the east of Light 110) on the northern side of the channel. The westerly end of the borrow pit has a relatively sharp right angle cut where it returns to the regular channel width. The borrow pit was dredged for the United States Army Corps of Engineers under Construction Contract, DCW 29-76-C-0253 with Mike Hooks, Inc.
 
 
 11
 The dredging was completed approximately six to eight weeks prior to the collision. However, support vehicles and other equipment remained in the area of the borrow pit until approximately three weeks prior to the collision. During that time vessels passing the area had to hold near the center line and proceed dead slow ahead one vessel at a time. According to the records of the Pilot's Association, no vessels had met and passed each other in the area of the westerly end of the borrow pit following the removal of the equipment from the area prior to June 17, 1977.
 
 B. The Collision
 
 12
 The events surrounding the collision itself are not in serious dispute. On the morning of June 17, 1977 Pilot Mark Delesdernier took over the conn of the SOUTHWIND in the vicinity of Light 98 and conned the vessel at full maneuvering speed inbound towards New Orleans. The vessel continued to proceed inbound to Shell Beach where she slowed to dead slow and then resumed full maneuvering speed on her passage to New Orleans. That same morning, Pilot Alexander Petit boarded the ASTROS at New Orleans and conned the vessel towards light 110 at full maneuvering speed. Both pilots were licensed and qualified as pilots by the State of Louisiana.
 
 
 13
 At or shortly after 0800 hours the SOUTHWIND and the ASTROS sighted each other and shortly thereafter the captains and the pilots of the vessels spoke to each other by VHF radio and agreed to a port-to-port passage as required by the Inland Rules of the Road. 33 CFR 80.10. At approximately 8:09 the SOUTHWIND went from full ahead to half ahead and at 8:10 she went to slow ahead to slow her speed for the expected meeting and passing with the ASTROS. At approximately the same time, the ASTROS went to slow ahead. (The engine bell recorder of the ASTROS reflects that the order for slow ahead was given at 8:14.5, while the bell book of the SOUTHWIND indicates that it went to slow ahead at 8:10. However, the evidence revealed that the clock on board the ASTROS was approximately one to two minutes ahead of the clock on the SOUTHWIND, thus largely accounting for the timing difference reflected in the orders given aboard the respective ships).
 
 
 14
 Thereafter, the SOUTHWIND blew a one-whistle signal indicating a port-to-port passage as had been previously agreed. Pilot Delesdernier moved the inbound SOUTHWIND from the center line of the channel to her starboard, which put the SOUTHWIND to the north of the center line of the channel. About the same time the outbound ASTROS moved from the center line to her starboard, putting her to the south of center line. Both vessels did this in order to effect the agreed port-to-port meeting.
 
 
 15
 The SOUTHWIND proceeded along the north side of the channel, parallel to the borrow pit at about eight knots. Her starboard side was approximately 150 to 160 feet from an imaginary line drawn from the regular bank. At approximately 8:14 Pilot Delesdernier noticed that the helmsman was carrying 10 degrees right rudder and that the SOUTHWIND's heading was still moving slightly to port. At this time the SOUTHWIND was nearing the westerly end of the borrow pit located to the north or to the starboard side of the vessel. Pilot Delesdernier, noticing that his ship's head was continuing to fall off to her port, ordered hard right rudder and full ahead. However, the SOUTHWIND would not pull out of her sheer to port. She was heading across the center line and toward the oncoming ASTROS. Realizing that the SOUTHWIND was not pulling out of her sheer to port, Pilot Delesdernier ordered full astern and started blowing the danger signal. The two vessels collided thereafter at about 8:16 according to the time indicated in the SOUTHWIND's bridge bell book and according to the ASTROS' logs and records about 8:17 or 8:18. Both vessels' personnel indicated that there was approximately one or two minutes from the time of the sheer to the time of the collision.
 
 
 16
 Approximately one minute before the collision Pilot Petit on board the ASTROS noticed the SOUTHWIND sheering and ordered dead slow. Almost immediately thereafter, the pilot of the SOUTHWIND called Pilot Petit and advised that the SOUTHWIND was "out of control" and requested that the ASTROS back her engines. The ASTROS immediately responded. At the time of the collision both the SOUTHWIND and the ASTROS were travelling approximately from four to four and one-half knots. The collision occurred approximately one-half mile or five to six cables east of Light 110 on the southwest side of the channel, approximately 100 feet south of the center line. The ASTROS suffered stem damage above the waterline and damage to the bulbous bow. The SOUTHWIND suffered damage forward on the starboard side where she crossed the bow of the ASTROS.
 
 
 17
 The immediate cause of the accident was never seriously in dispute. Professor Pauling, an expert naval architect, testified that the sheer occurred because of the hydrodynamic forces operating on the vessel as it moved along the north bank of the channel. In particular, Professor Pauling explained that the movement of a vessel along a bank produces an imbalance of pressure generated by the water displaced at the bow and stern on the side of the vessel facing the bank. This imbalance produces what is known as a "turning moment", which tends to turn the bow outward from the bank. According to Professor Pauling, there are three variables affecting this effect on the vessel: (1) the speed of the vessel; (2) the size of the vessel; and (3) the proximity to the bank. Therefore when a vessel moving at a constant speed suddenly encounters a change from a wide separation from the bank to a narrower separation the turning moment greatly increases, forcing the bow away from the bank.
 
 
 18
 Using a ship modelled after the SOUTHWIND and a bank configuration based on that existing at the place of the collision, Professor Pauling concluded that the turning force generated would overcome the force of the rudder when the vessel was within 175 feet of the extended line of the bank. Beyond 175 feet, he concluded, the rudder of the ship could overcome the force generated by the water displaced by the ship. I found that Professor Pauling's explanation of the cause of the sheer taken by the SOUTHWIND was credible and quite interesting.
 
 
 19
 It should be noted, however, that Professor Pauling discounted one theory of why the sheer occurred presented by Pilot Delesdernier. At the Coast Guard Hearing into the collision, Pilot Delesdernier testified that he thought that the sheer was caused by a trench or "berm" extending downstream from the original channel bank and separating the dredged area from the main channel. Pilot Delesdernier speculated that the berm acted like a "fin" channeling the water and serving as a bow thruster. However, Professor Pauling testified that based upon his experimentation the berm did not cause the sheer, as any force it might have generated could be easily overcome by the rudder of the SOUTHWIND. Professor Pauling concluded that it was the narrowing of the bank at the edge of the pit, rather than the berm which caused the SOUTHWINDS's sheer.
 
 
 20
 Transorient Navigators Co. v. M/S SOUTHWIND, 524 F.Supp. 373, 374-76 (E.D.La.1981).
 
 
 21
 Transorient Navigators Co. S/A [Transorient], the owner of the ASTROS, filed suit against Westwind Africa Line, Ltd. [Westwind], the owner of the SOUTHWIND in personam and against the SOUTHWIND itself in rem, seeking damages for the loss it suffered as a result of the collision. Westwind filed suit against the Secretary of the Army, the Army Corps of Engineers, and the United States, contending that its vessel, the SOUTHWIND, sheered across the channel and collided with the ASTROS because of the negligence of the United States in failing to properly manage, operate and maintain the MR-GO. Flower Mills of Nigeria, Ltd. [Flower Mills], owner of the cargo aboard the SOUTHWIND, filed suit against the ASTROS in rem and against Transorient in personam, seeking to recover for damage to its cargo. The court consolidated the above actions. Westwind filed answer to the complaint of Transorient, denying liability, and filed claim against Transorient in personam, and against the ASTROS in rem, claiming that the collision was caused by the negligence of the ASTROS. Transorient filed claim against the Secretary of the Army, the Army Corps of Engineers, and the United States seeking to recover all damages sustained as a result of the collision. Flower Mills also filed a claim against the United States through the Army Corps of Engineers, seeking to recover damages for cargo loss. The case was tried to the court only on the issue of liability. The district court's findings and conclusions are summarized below.
 
 
 22
 (1) The ASTROS was entirely without fault.
 
 
 23
 (2) The SOUTHWIND's sheer to port clearly violated Rule 80.10 of the Rules of the Road for Inland Waters, creating a presumption of liability on its part.
 
 
 24
 (3) Pilot Delesdernier, who was conning the SOUTHWIND at the time of the accident, should have been aware of the rectangular cut at the end of the borrow pit.
 
 
 25
 (4) Pilot Delesdernier was aware of the rectangular cut at the end of the borrow pit.
 
 
 26
 (5) The Corps' failure to notify pilots of the rectangular cut at the end of the borrow pit was not a cause of the accident, because Pilot Delesdernier did not know that a sharp change in the bank configuration could cause sheering.
 
 
 27
 (6) Even if the Corps had provided a warning that the rectangular cut could cause sheering, Pilot Delesdernier should have known of this effect in any event. Therefore, any failure to warn on the part of the Corps was not a proximate cause of the sheer and resulting collision.
 
 
 28
 (7) Pilot Delesdernier was navigating closer to the starboard bank at the time of the collision than was customary. He was therefore negligent in attempting to pass in an unsafe manner under the circumstances, and in failing to know of and consider the sheering effect created by the rectangular cut at the end of the borrow pit.
 
 
 29
 (8) Pilot Delesdernier's negligence was the sole cause of the collision.ANALYSIS:
 
 Standard of Review
 
 30
 In McAllister v. United States, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20 (1954), the Supreme Court held that:
 
 
 31
 In reviewing a judgment of a trial court, sitting without a jury in admiralty, the Court of Appeals may not set aside the judgment below unless it is clearly erroneous. No greater scope of review is exercised by the appellate tribunals in admiralty cases than they exercise under Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A..... A finding is clearly erroneous when " 'although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed.' "
 
 
 32
 McAllister, 75 S.Ct. at 8, quoting United States v. Oregon State Medical Society, 343 U.S. 326, 72 S.Ct. 690, 698, 96 L.Ed. 978 (1952), quoting United States v. United States Gypsum Co., 333 U.S. 364, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948) (citations omitted); accord Musial v. A & A Boats, Inc., 696 F.2d 1149, 1153 (5th Cir.1983); Trautman v. Buck Steber, Inc., 693 F.2d 440, 442 (5th Cir.1982).[2]
 
 
 33
 Questions of negligence and proximate cause in admiralty cases tried to the court are treated as fact questions reviewable under this standard. Cheek v. Williams-McWilliams Co., 697 F.2d 649, 652 (5th Cir.1983); F & S Offshore, Inc. v. K.O. Steel Castings, Inc., 662 F.2d 1104, 1109 (5th Cir.1981); Signal Oil & Gas Co. v. Barge W-701, 654 F.2d 1164, 1172 (5th Cir.1981), cert. denied, 455 U.S. 944, 102 S.Ct. 1440, 71 L.Ed.2d 656 (1982); S.C. Loveland, Inc. v. East West Towing, Inc., 608 F.2d 160, 166 (5th Cir.1979), cert. denied, 446 U.S. 918, 100 S.Ct. 1852, 64 L.Ed.2d 272 (1980).
 
 Physical Cause of Collision
 
 34
 We find no error in the district court's finding that the physical cause of the accident was a sheer to port caused by unequal hydrodynamic forces acting on the bow, midship section, and stern of the SOUTHWIND as it approached the western end of the borrow pit. The expert testimony adduced at trial clearly showed that as the SOUTHWIND approached the submerged rectangular cut at the western end of the 2 mile long pit, it experienced an extreme, sudden increase in pressure along the starboard section of the bow, unmatched by qualitatively similar hydrodynamic forces exerted upon the length of the vessel. The imbalanced force vectors generated a turning moment for which the rudder could not compensate, causing the vessel to sheer sharply to port and into the path of the oncoming ASTROS.
 
 Duty of the Corps
 
 35
 The district court found the Corps free of any negligence that might have caused the collision.
 
 
 36
 It is well-settled in this circuit that the duty owed by the Army Corps of Engineers in claims brought under the Suits in Admiralty Act, 46 U.S.C. § 741 et seq., is equal to "that of a private person in like circumstances." Southern Natural Gas v. Pontchartrain Materials, Inc., 711 F.2d 1251 at 1254 (5th Cir.1983). This standard requires the use of due care. Pontchartrain Materials, supra at p. 1254; De Bardeleben Marine Corp. v. United States, 451 F.2d 140, 149 (5th Cir.1971).
 
 
 37
 Corps Regulation No. 1130-2-306 requires the Corps to publish information regarding changes in channel conditions caused by dredging. This regulation is clearly designed to ensure the safety of navigation in the MR-GO. The regulation requires that the Corps publish a complete description of any conditions which might be hazardous to navigation, including drawings or sketches where these would prove helpful.[3]
 
 
 38
 In the present case, the Corps radically changed the channel configuration by dredging a borrow pit whose westernmost, submerged extremity made a right angle with the bank. However, the record is devoid of any evidence that, prior to the collision, the Corps published any information or notice advising mariners of the unique contours of the channel bed and bank at the westernmost end of the pit. On the contrary, the record contains persuasive testimony that the Corps never published any information regarding the borrow pit it was dredging,[4] except for routine notices that dredging was proceeding at certain points along the river.[5] This was so despite the fact that the MR-GO pilots rely heavily upon the Corps for information concerning conditions in the waterway.[6]
 
 
 39
 Although the Corps is not under any duty to warn of dangerous shoaling when it has neither the duty to survey the channel to detect shoaling, nor knowledge of such a condition, Canadian Pacific (Bermuda) Ltd. v. United States, 534 F.2d 1165, 1168-70 (5th Cir.1976), where the Corps itself radically alters the configuration of the channel, regulation 1130-2-306 (see note 3 supra ) plainly requires publication of that information.[7] A radical change in submerged bank configuration and relative channel depth is certainly something which might reasonably be expected to affect navigation in the MR-GO. Here, the Corps breached its duty to advise mariners under its own regulation. Its failure to publish this information constituted a failure to use due care.
 
 Duty of Pilot
 
 40
 The law imposes a heavy duty on river pilots. In Atlee v. Packet Co., 88 U.S. (21 Wall.) 389, 22 L.Ed. 619 (1874), the Supreme Court defined that duty in the following terms:
 
 
 41
 The pilot of a river steamer ... is selected for his personal knowledge of the topography through which he steers his vessel.... He must know where the navigable channel is.... He must also be familiar with all dangers that are permanently located in the course of the river, of sand-bars, snags, sunken rocks or trees, or abandoned vessels or barges. All this he must know and remember to avoid. To do this he must be constantly informed of changes in the current of the river, of sand-bars newly made, of logs and snags, or other objects newly presented against which his vessel might be injured.
 
 
 42
 Id. at 396. Accord, Petition of M/V Elaine Jones, 480 F.2d 11, 20 (5th Cir.1973).
 
 
 43
 In Davidson S.S. Co. v. United States, 205 U.S. 187, 27 S.Ct. 480, 51 L.Ed. 764 (1907), the Supreme Court found the pilot negligent because of his failure to look into conditions about which an experienced pilot would have desired further information.
 
 
 44
 In Elaine Jones, supra, this court found negligence on the part of a pilot who failed to inform himself of current conditions arising from circumstances that should have been known to him. Elaine Jones, 480 F.2d at 22.
 
 
 45
 We must therefore ask ourselves both what Pilot Delesdernier knew, and what he should have known, about the borrow pit dug by the Corps.
 
 
 46
 The district court resolved the first of these questions in the following manner:
 
 
 47
 It is undisputed that Pilot Delesdernier knew well before the accident that the Corps was dredging the north bank of the channel in the vicinity of Light 110. Pilot Delesdernier also testified at the Coast Guard hearing into the collision, the transcript of which was admitted into evidence by stipulation, that he was familiar with the surface characteristics of the borrow pit. (C.G. transcript, p. 203). I find his later assertion at trial that it was not clear where the pit ended and the regular bank line began not credible. Pilot Delesdernier therefore was aware of the rectangular cut at the end of the borrow pit and the sudden narrowing of the channel.
 
 
 48
 Transorient Navigators, 524 F.Supp. at 379. Record evidence supports the district court's finding that Pilot Delesdernier was familiar with the surface characteristics of the borrow pit. It does not follow, however, that the pilot was aware of the contours of the submerged bank at the pit's westernmost end. The chart prepared after the accident and presented at trial shows that the steepest rise in the submerged bank falls in an area between 350' and 500' east of the visible bank. The banks of the MR-GO are constantly shifting as a result of erosion, and are not reliable indicators of the depth or contours of the adjacent bottom, particularly several hundred feet off the bank. We find no evidence in the record to support the district court's finding that Pilot Delesdernier knew of the crucial channel floor contours lying just east of the visible bank. Rather, we are firmly persuaded that an error has been committed here. The pilot himself testified on several occasions that he had no such knowledge, and we do not see how he could have known of these conditions without investigating them. See note 4, supra. The court's inference that the pilot was familiar with the contours of the underwater bank is clearly erroneous.
 
 
 49
 The next question we must ask is whether Pilot Delesdernier should have known of the underwater rectangular cut at the western end of the borrow pit.
 
 
 50
 The answer to this question is obvious. Atlee, Davidson and Elaine Jones all require a pilot to inform himself of conditions about which an experienced pilot would have desired further information. Pilot Delesdernier knew the surface configuration of the borrow pit. He knew that the bank at the western end of the pit made a sharp angle perpendicular to his line of motion. This knowledge should have triggered his pilot's instincts, leading him to ascertain just what sort of conditions the borrow pit might conceal. This was especially important in light of his testimony that he could not clearly determine the configuration of the westernmost bank itself as he approached it.[8] His failure to inquire into this matter takes on added significance when we consider that he was travelling perhaps 50' closer to the extension of the visible bank at the time of the accident than was the custom. At the Coast Guard hearing, Pilot Delesdernier testified that vessels generally attempted to pass 50' to 60' from the center line of the MR-GO. Such a passage would have left over 200' between his vessel and the extended bank line, instead of the 150'-160' actually separating the two just before the sheer began. Had the pilot made an effort to ascertain the character of the borrow pit at its westernmost end, his pilot's sense would have caused him to maintain more distance between his vessel and the extended bank line.[9] We conclude that Pilot Delesdernier failed in his duty as a pilot to inform himself of conditions into which he had good reason to inquire, and was therefore negligent.[10]
 
 Proximate Cause and Liability
 
 51
 The SOUTHWIND's sheer to port across the center line of the MR-GO was in clear violation of Rule 80.10 of the Rules of the Road for Inland Waters, which states:
 
 
 52
 "[I]n narrow channels every steam vessel shall keep to the side of the fairway or mid-channel which lies on the starboard side of the vessel."
 
 
 53
 This statutory violation creates a presumption of liability against the SOUTHWIND under the rule of The Pennsylvania, 86 U.S. (19 Wall.) 125, 22 L.Ed. 148 (1874). At trial, the SOUTHWIND presented not one shred of evidence of any negligence on the part of the ASTROS to rebut this presumption. The trial court correctly found that the ASTROS was in no way liable for the collision.
 
 
 54
 The presumption of liability under the rule of The Pennsylvania does not, however, factor into our determination of the relative liability of the SOUTHWIND and the Corps. By crossing the center line, the SOUTHWIND did not expose the Corps to any danger, or collide with the Corps. Any negligence on the part of the Corps occurred before the SOUTHWIND sheered, and is relevant to the question of liability only insofar as it caused or contributed to the sheer which took the SOUTHWIND into the path of the ASTROS.
 
 
 55
 The district court found that the Corps' failure to publish information regarding the underwater contours of the borrow pit could not be a proximate cause of the accident, because the pilot already possessed this information. We have already determined that the district court erred in its conclusion that the pilot was aware of the subsurface configuration of the pit. We therefore reject the court's conclusion that the Corps' breach of its duty was not a proximate cause of the accident on those grounds.
 
 
 56
 The district court further determined that "even if the Corps of Engineers had provided complete information about the configuration of the channel, Pilot Delesdernier would not have recognized the danger." Transorient Navigators, 524 F.Supp. at 380. The court's conclusion was based on its observation that after Pilot Delesdernier had had the opportunity to study a chart of the area, he incorrectly identified the cause of the sheer as a trench or berm extending along the edge of the pit parallel to his line of motion.
 
 
 57
 The record does show that Pilot Delesdernier believed that the sheer was caused by this berm. The pilot hit upon the berm as the most likely cause of the sheer because of his belief that water channeled between the pit bank and the berm created a current at the westernmost end of the pit travelling at right angles to the extended bank line, and forcing his vessel out into the channel. However, it does not follow that because the pilot preferred what initially appeared to be a more plausible, ultimately erroneous explanation of the sheer, that he was unable to understand the real cause of the sheer, or would not have recognized the danger presented by the submerged rectangular cut.[11] On the contrary, the record clearly shows that Pilot Delesdernier was well aware that approaching a bank, submerged or otherwise, at anything less than a tangent would generate unequal forces causing a vessel to sheer.[12] The vessel in the present case approached the submerged bank at almost a right angle.
 
 
 58
 Pilot Delesdernier also gave a detailed explanation at trial of the phenomenon known as "bank suction," demonstrating his knowledge of precisely those hydrodynamic forces which, when they become sufficiently imbalanced, cause a vessel to sheer away from the bank. His testimony demonstrated his familiarity with the forces that caused his vessel to sheer to port and collide with the ASTROS. In general, pilots are familiar with bank suction and bank sheer.[13] Pilot Delesdernier was familiar with both these phenomena. Again, we are left with the firm and definite conviction that a mistake has been made. Accordingly, we find clearly erroneous the court's conclusion that even if the Corps had provided complete information about the configuration of the channel, Pilot Delesdernier would not have recognized the danger, and would have acted no differently.
 
 
 59
 The Corps failed in its duty to publish information about the dangerous contours of the submerged bank at the westernmost end of the borrow pit. Had Pilot Delesdernier possessed this information, we believe that he would have taken greater care in passing the ASTROS at this point in the waterway, and thereby avoided the accident. The Corps' breach of its duty to supply this information was therefore a proximate cause of the accident.[14]
 
 
 60
 Pilot Delesdernier had a duty as a pilot to inform himself of any possible hazards to navigation which he had reason to suspect might be present. The pilot clearly breached his duty as well.
 
 
 61
 However, just as the Corps' breach of its duty does not relieve the pilot of liability, his breach of his duty does not relieve the Corps of liability either. As we said in Inter-Cities Navigation Corp. v. United States, 608 F.2d 1079 (5th Cir.1979):
 
 
 62
 In a maritime collision, as for any tortious injury, an act or omission must have a reasonable connection in fact with a collision in order to find contributory fault on the part of the actor or omittor. Gilmore & Black, The Law of Admiralty § 7-5 (2d ed. 1975); W. Prosser, The Law of Torts § 41 (4th ed. 1971). As we have often stated, "fault which produces liability must be a contributory and proximate cause of the collision, and not merely fault in the abstract." Board of Commissioners of Port of New Orleans v. M/V FARMSUM, 574 F.2d 289, 297 (5th Cir.1978) ...; Gilmore & Black, The Law of Admiralty § 7-5, at 494 (2d ed. 1975). Where two or more actors combine to contribute to the collision, each need not be the sole cause, but only a substantial and material factor in causing the collision. W. Prosser, The Law of Torts § 41, at 240 (4th ed. 1971).
 
 
 63
 Id. at 1081. We applied this rule in Allied Chemical Corp. v. Hess Tankship Co. of Delaware, 661 F.2d 1044 (5th Cir.1981). In Hess, the tanker S/S HESS REFINER and the tug SOCRATES collided in the Mississippi River. Following the collision, the REFINER drifted aimlessly downriver, finally striking what was claimed to be a steel beam from the sunken M/V T-TRUC # 1 that gouged a 30' gash in her hull. The REFINER brought a claim against (1) Savare DeFelice, owner of the sunken M/V T-TRUC # 1; (2) Great Fortune Navigation Ltd., owner of the vessel that collided with and sank the M/V T-TRUC # 1; and (3) the Coast Guard, which REFINER alleged was under a duty to raise or mark the wreck. The trial court refused to consider the negligence of any of these defendants. We disagreed, stating:
 
 
 64
 The District Judge made no specific findings as to the conduct of DeFelice, Great Fortune and the United States, holding that the accident resulted solely from the tug's and tanker's failure to exercise the wisdom of Socrates. Here, we believe, he was technically mistaken. The concept of new and intervening cause would not displace fault, if any, on the part of DeFelice, Great Fortune and the United States toward REFINER. A subsequent negligent act does not excuse prior negligence except in most unusual circumstances. It would only mean that all actors, past and present, must divvy up the liability. See Restatement of Torts 2d, § 442B.
 
 Id. at 1060.[15]
 
 65
 Had DeFelice, Great Fortune or the United States not breached their duty to remove or mark the wreck, the REFINER would not have collided with it. Similarly, had the Corps not breached its duty to publish the required information in our case, the collision would not have occurred. The fact that the REFINER's and the SOCRATES' subsequent negligence caused a collision which led to the REFINER's subsequent collision with the submerged wreck does not excuse the defendants' prior fault. Similarly, the fact that the pilot in our case failed to inform himself of potentially hazardous conditions does not excuse the prior fault of the Corps.
 
 
 66
 Both the Corps and the SOUTHWIND's negligence were a proximate cause of the collision between the SOUTHWIND and the ASTROS. Neither party's negligence excuses the other's. Under the rule of United States v. Reliable Transfer Co., 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975), liability must be allocated between the negligent parties based upon an assessment of their comparative fault. Tringali Brothers v. United States, 630 F.2d 1089, 1090 (5th Cir.1980). Accordingly, we REVERSE that part of the district court's judgment finding no liability on the part of the Army Corps of Engineers, and REMAND so that the district court can apportion damages in accordance with Reliable Transfer, making appropriate findings of fact.[16] Costs on this appeal shall be divided equally between the SOUTHWIND and the United States Army Corps of Engineers.
 
 
 
 [1]
 A "borrow pit" is an area from which fill is dredged (borrowed) for some other purpose. Here, the fill was used to build hurricane levees to the east and south of the MR-GO
 
 
 [2]
 See also Mac Towing, Inc. v. American Commercial Lines, 670 F.2d 543, 546 (5th Cir.1982); T.J. Stevenson & Co. v. 81,193 Bags of Flour, 629 F.2d 338, 348-49 (5th Cir.1980); Compania Anonima Venezolana De Naugacion v. A.J. Perez Export Co., 303 F.2d 692, 694 (5th Cir.), cert. denied, 371 U.S. 942, 83 S.Ct. 321, 9 L.Ed.2d 276 (1962); and Myles v. Quinn Menhaden Fisheries, Inc., 302 F.2d 146, 148 (5th Cir.1962). Although this court has on occasion applied a "Plimsoll Line variant" of this standard in admiralty cases, see, e.g., Wirth Ltd. v. S/S Acadia Forest, 537 F.2d 1272, 1285 (5th Cir.1976); California & Hawaiian Sugar Co. v. Columbia S.S. Co., 510 F.2d 542, 543 (5th Cir.1975); Theodories v. Hercules Navigation Co., 448 F.2d 701, 705 (5th Cir.1971) and cases cited therein; cf. Cook & Nichol, Inc. v. Plimsoll Club, 451 F.2d 505 (5th Cir.1971); there is no difference between that "variant" and the standard of review set forth in McAllister. The "Plimsoll Line variant" affords the reviewing court greater latitude than would an appeal from a jury verdict, Oil Screw Noah's Ark v. Bentley & Felton Corp., 322 F.2d 3, 5 (5th Cir.1963), allowing us to rely upon our conviction that a "fundamentally wrong result has been reached." Id. at 6. This is effectively the same standard of review mandated by McAllister. Compare Oil Screw Noah's Ark, 322 F.2d at 5-6 with Loehr v. Offshore Logistics, Inc., 691 F.2d 758, 760-61 (5th Cir.1982)
 
 
 [3]
 Regulation No. 1130-2-306 (May 8, 1978) of the Army Corps of Engineers requires the Corps to provide the following information:
 "8. Changes affecting navigation will be made promptly whenever information of immediate concern to navigation becomes known. Items of information especially desired are: (1) channel condition as revealed by surveys; (2) changes in channel conditions, either by natural causes or by dredging or other work; (3) changes in approved projects for improvement with statements of results expected from proposed operations; (4) descriptions of proposed dredging or other Federal work of improvement such as breakwater, pier, and revetment construction or alterations; (5) ..."
 "b. Additional items of information desired are: (1) ... (2) unchartered shoals, and other obstructions to navigation and particulars as to proposed or completed removal of same; (3) ... (4) ... (5) ... (6) established or existence of danger areas in navigable waters. Reproductions of drawings or sketches which will be helpful in interpreting the date [sic] shall accompany the reports. The reports will not be limited to a reference to an accompanying drawing or sketch, but will contain a complete description in form suitable for publication in notices to mariners and the monthly supplements to the U.S. Coast Pilot. In this respect, the reports will provide enough information that a single notification to navigational interests will suffice. In the case of dredging or construction work, the mere statement that work will commence or has commenced on a certain date is insufficient. All additional information possible, such as probable duration of operations and object of work, will be given. In the case of dredging, extent of the area to be dredged and the depth expected will be provided...." (Emphasis added).
 
 
 [4]
 The record contains the following exchanges between counsel and Mark Delesdernier, pilot of the SOUTHWIND:
 Q Now, did the Corps of Engineers give you any indication as to when this job was completed or as to what the contours of the borrow pit would be?
 A To my knowledge, there was never a notice to mariners sent to the pilots, who are sometimes on the mailing list of the Corps, or to the Pilots Association or anybody else. In fact, we didn't even have any idea what they were doing.
 ....
 Q Captain, to your knowledge, did you or did the pilots' association to which you belong ever ask the Corps of Engineers what was going on in that area when the dredging was proceeding?
 A To my knowledge, we didn't, but from past experience we are on the list of notice to mariners, and they automatically send us information pertaining to projects like this.
 Q Did you ask for any such information?
 A I, as a pilot, no.
 Q Do you recall receiving any such information from the Corps of Engineers?
 A I didn't receive anything.
 Pilot Delesdernier's testimony in proceedings before the Marine Board of Investigation [Coast Guard Board] held shortly after the accident corroborates his testimony at trial.
 Q Were you aware, during this several month period where the dredges were operating and the pipeline was in place, of the nature of their operation?
 A Not exactly.
 Q Were you aware that they were excavating?
 A We were aware that they were dredging but nothing about the contour of the bottom or how deep or how long or how far back or no particulars.
 I have never received anything in a "Notice to Mariners."
 If it came out, I don't have it; but we were aware of the dredges in the area, that's all.
 Any other particulars, no.
 ....
 Q Did you have any knowledge as to the condition of the bottom or the side of the channel after the dredging operations had terminated?
 A I went through--not through "Notice to Mariners" or anything that I had that I would have had any idea that this borrow pit was five foot deep or a hundred foot deep or what the dimensions were.
 Nothing has ever been given to us on this.
 We really didn't know what the Corps of Engineers was doing at all.
 ....
 Q It is your testimony that you had no knowledge of the bottom characteristics or the characteristics below the surface in the area of what we call the borrow pit?
 A That is correct.
 I had no idea that they were deep or really, until the time of the incident with the SOUTHWIND, did I have any idea of how wide it was or how long it was.
 Q Did you or did your Pilots Organization make any inquiry to ascertain the characteristics of the borrow pit below the surface prior to the collision?
 A We did not. We felt it insignificant and we felt that the Corps of Engineers must know what they were doing since they were coming in and digging out the sides of a channel that they designed and dredge.
 So we felt no need to inquire into any change in characteristics of the channel.
 It is almost like a man selling you an airplane and you hope it is going to fly.
 Pilot Delesdernier's testimony was corroborated at trial by that of Captain Arnoult, President of the Crescent River Port Pilots Association.
 Q Captain, back to my original question. You were, were you not, both as a pilot and as president of the Crescent Port Pilots Association, aware that dredging had been going on for a while in what we were calling the borrow pit area?
 A Yes.
 Q And you had received regular notices about the dredging itself, hadn't you?
 A That's correct.
 Q Now, at the conclusion of that, when the dredging equipment had been taken away, did you personally or did the pilots' association, of which you were then president, make any inquiries of the Corps of Engineers or the Coast Guard, or of any other government agency, as to what had been accomplished in that area?
 A No, we didn't.
 
 
 [5]
 The only reference to any specific publication occurs in response to a question put to Pilot Delesdernier before the Coast Guard Board
 Q And as I understand your testimony you were unaware of there being a corner at the western end of this dredged area?
 A Yes.
 Q Now, I show you a document dated 4 May 1977, which is put out by the Department of the Army, the New Orleans District Corps of Engineers.
 (Document handed to witness.)
 And it is Navigation Bulletin No. 77-62, and I will ask you to read that document.
 A (Witness complies.)
 All right.
 Q Have you read that document?
 A Yes.
 Q I want you to assume that that is the last Navigation Bulletin put out before June 17th, 1977. I want to know whether or not that bulletin states anything whatsoever concerning a dredged borrow pit in the vicinity of Light 109, 110?
 A It just says dredging in progress from Mile 15.8 to Mile 6.
 Q So it doesn't have anything in it; is that correct?
 A But it doesn't tell me about what it is doing.
 Testimony by Captain Arnoult, President of the Crescent River Port Pilots Association, indicated only that the Association received notices that dredging was in progress. See note 4, supra. The Corps does not deny that it failed to publish anything more than routine notices that dredging was in progress.
 
 
 [6]
 Captain Arnoult testified as follows:
 Q Now, you, as a pilot, who do you rely on insofar as the channel width, the channel depth and the navigation elements of the channel? What branch of the government do you rely on to maintain that in a proper manner?
 A The Corps of Engineers.
 Pilot Delesdernier testified before the Coast Guard Board that he relied upon the Corps for information about the MR-GO.
 Q Captain, you, as a river pilot, depend on the Corps of Engineers and the Coast Guard for your information concerning channels; isn't that correct?
 A Yes.
 Q If they don't give you any indication that there is something unusual insofar as a dredging operation is concerned, do you concern yourself with it as a pilot?
 A Yeah, I would, because I wouldn't know what to expect at the last minute because I could be running into fog and all of a sudden--
 Q I am not talking about when the dredge is there. I am talking about after the dredging operation is over.
 A Yeah, I would like to have some sort of information, when the operation was finished so that I would know that the channel was clear.
 Q Have you ever gone to the Corps of Engineers to get such information?
 A No, sir.
 Q You have never done it in your career?
 A Never.
 The only thing is we get the thing from the Engineers giving us the channel and whatnot, the locks and so forth.
 His testimony at trial was no different.
 Q Now, one of the questions that the government asked you, why didn't you or your association make any inquiries into any changes in navigation.
 Is that something you expect the notices from the Army to tell you or do you feel that you have to make independent inquiries?
 A We have never had need before to make any inquiries on the dredging that was going on. We were sent notices and that was it, you know. No one ever told us why they were dredging or--You know, I just--
 Q So you realy [sic] on the Corps of Engineers, the part who's actually doing the dredging and locating the channel, to warn you of anything out of the ordinary?
 A That's correct.
 There was no testimony before the Coast Guard Board or at trial to the effect that pilots did not, or should not, rely upon the Corps for information concerning the MR-GO.
 
 
 [7]
 We do not construe the regulation as requiring the Corps to warn of every conceivable hazard arising from some change in the waterway. However, where as here the Corps creates, and therefore perhaps alone knows of, a submerged 90? cut in the channel, the regulation at least requires that the Corps take appropriate steps to notify mariners of this "change in channel conditions ... by dredging" constituting "information of immediate concern to navigation." See note 3, supra for the text of the regulation
 
 
 [8]
 Pilot Delesdernier testified at trial as follows:
 THE COURT: Why didn't you contemplate this sheer? You could see the bank coming up to you.
 THE WITNESS: Because all of the trips that I made, and I piloted over 6,000 ships, not only in the Mississippi-Gulf Outlet, I was very comfortable in the position that I was navigating the ship in the channel from past experience.
 THE COURT: But you saw this abrupt ending of the wide water. Why didn't you anticipate a sheer?
 THE WITNESS: I really didn't see it, sir. It's tidal. It's in and out of the water, and it didn't appear to be pronounced to me. It didn't appear to be significant.
 THE COURT: How pronounced is it? Does it show in daylight just like it shows on that chart up there?
 THE WITNESS: It will show a little on the radar if it is extremely low tide, north wind and extremely low tide. No wind, no moon, north wind, extremely low tide.
 
 
 [9]
 We note that since the date of the collision, pilots on the MR-GO have switched to an unusual starboard-to-starboard passage in this stretch of the waterway in order to avoid the sheering forces generated by a port-to-port passage
 
 
 [10]
 Pilot Delesdernier was not alone in failing to ascertain the precise nature of the borrow pit. The record shows that no pilot ever undertook to inquire into these conditions. Pilot Delesdernier just happened to be the first of the six MR-GO pilots to attempt a normal port-to-port passage in the vicinity of the westernmost end of the borrow pit following relaxation of the speed restrictions that accompanied dredging. Their negligence, however, does not excuse his own
 
 
 [11]
 Ironically, had the Corps published the required information, the pilot's belief in his erroneous theory would still have caused him to give the pit a wide berth, thus avoiding the sheer and the resulting collision
 
 
 [12]
 In his testimony before the Coast Guard Board, Pilot Delesdernier gave the following explanation of bank sheer
 A If a vessel is piloted in the north or south half of the channel, whether it be eastbound or westbound, and it's steering with a plus or minus five degrees of rudder and proceeding at a reduced speed, such as the SOUTHWIND, of approximately eight knots, then the vessel is in excellent control.
 But had the SOUTHWIND maneuvered from the south bank to the north bank at a 30 or 40 degree angle, somewhere upon approaching the north bank we would have had tremendous pressure of water against the starboard bow and none against the stern which would have caused the port sheer.
 This vessel was proceeding parallel and sufficiently enough in the channel, even despite the borrow pit, that she should have maintained her course and heading without any difficulty had we not encountered this unusual pressure on the starboard bow of the vessel....
 
 
 [13]
 Captain Arnoult, President of the Crescent River Port Pilots Association, showed that he was familiar with bank forces
 Q Now, as you are piloting vessels in the Mississippi River-Gulf Outlet, is it fair to say that sometimes your vessel does have a tendency to move away from the bank?
 A Yes, the pressure will move you.
 Q And that pressure is normally corrected by a movement of the helm to starboard, is that correct?
 A Well, depending on which side--
 Q Excuse me, a movement of the helm in the opposite direction from which you're being pushed away from the bank?
 A That's correct.
 
 
 [14]
 To use the "well-worn vernacular of proximate causation," the collision would not have occurred but for the Corps' breach of its duty. Allied Chemical Corp. v. Hess Tankship Co. of Delaware, 661 F.2d 1044, 1060 (5th Cir.1981)
 
 
 [15]
 See also Inland Oil & Transport Co. v. Ark-White Towing, 696 F.2d 321, 326 (5th Cir.1983) ("But the fact that the KIMBERLEY's negligence was one but-for cause of the collision does not prevent the CUMMINGS' negligence from being another but-for cause.")
 
 
 [16]
 We note that the district court anticipated the possibility of a remand on these grounds in footnote 4 of its opinion
 The SOUTHWIND's argument that the United States failed to notify the pilots of the conditions in the channel also ignores Atlee and its progeny, which indicate that a pilot has a special duty to discover local features of navigation which are not found on the charts or notices to mariners. See cases cited in Petition of M/V Elaine Jones, 480 F.2d 11 (5th Cir.1973). In this case, Pilot Delesdernier and the other pilots knew of the dredging going on, but failed to inquire of the United States about the scope of the project or its final result. Therefore, even if more knowledge of the channel and burrow [sic] pit could have prevented the accident, I do not believe that Pilot Delesdernier can shift the entire fault for the accident on to the United States.
 Transorient Navigation, 524 F.Supp. at 380 n. 4. Because Pilot Delesdernier's negligence plainly contributed to the collision, we agree with the district court that the Corps should not bear the entire liability for the accident.